J-A12038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: T.K.M.  :  IN THE SUPERIOR COURT OF
                              :          PENNSYLVANIA
                              :
APPEAL OF: B.J., FATHER  :
                              :
                              :
                              :
                              :
                              :  No. 1230 WDA 2021

Appeal from the Order Entered October 1, 2021
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-21-0239

BEFORE: MURRAY, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:          **FILED: June 3, 2022**

In this matter, B.J. ("Father") appeals the October 1, 2021 order of the Court of Common Pleas of Washington County Orphans' Court terminating his parental rights to his son, T.K.M. ("Child"), who was born in 2017. After careful review, we discern no abuse of discretion and affirm.

We glean the following, tragic chain of events from the record and from the orphans' court's December 21, 2021 opinion (TCO). Child currently resides in Washington County, Pennsylvania with his maternal grandmother ("Grandmother") and maternal grandfather ("Grandfather," and together, "Grandparents"). Approximately two years prior to Child's birth, his mother ("Mother") informed her parents that she suffered from drug addition, specifically heroin use. She entered a rehabilitation facility, was discharged,

_____

[*] Retired Senior Judge assigned to the Superior Court.

suffered a relapse, returned to rehabilitation, and returned, together with Father, then her boyfriend, to reside in her parents' home.

Mother continued to battle substance abuse issues, and Grandparents arranged for treatment for her in California, paying the costs for Father to fly to California with their daughter and then fly back to Pennsylvania, where he continued to live in Grandparents' home while she was being treated. Mother returned home, suffered another relapse, and returned to California for treatment; while she was in California, and Father was still residing in their home, Grandparents learned that Father, too, was abusing drugs, and Grandparents arranged for his transportation to a drug rehabilitation facility in eastern Pennsylvania. After approximately seven weeks, he returned to Grandparents' home.

In 2016, Mother, again living at her parents' home with Father, began refusing the Vivitrol injections she was receiving to block her opiate cravings, and left Grandparents' home with Father. Approximately five months later, the couple, who had no place to stay and were wandering the streets, returned, with Grandparents again arranging for treatment for the two of them. Following treatment, the couple returned to Grandparents' home and remained there during the summer of 2016, each taking monthly Vivitrol injections.

Mother became pregnant in August 2016, and Mother and Father did well throughout the course of Mother's pregnancy, attending Narcotics Anonymous meetings frequently. Father began to work at this time. Child

contracted herpes during his birth and spent three weeks in intensive care thereafter, but Mother and Father continued to do well, and moved into their own residence with Child in December 2017.  However, after Father fell on ice and injured his shoulder, he was unable to work and they moved back into Grandparents' home in March 2018.

In July 2018, Father was informed that his three older children from a prior relationship had been removed from their mother's care, and Grandparents agreed that they, too, could come to live in their home.  In October 2018, Mother and Father were married.  On April 12, 2019, Mother left the house with Child to run errands, picked up Father at work, and eventually, the three of them returned home; later that evening, Mother was discovered in the bathroom, unresponsive, and was found to have passed away from a heroin overdose.  On the day after Mother's death, Father relinquished a bottle of oxycodone to Grandmother, telling her that he had been taking the pills but no longer wanted to do so; Grandparents remained supportive of Father and again arranged for Vivitrol injection appointments for him.  Father suggested that he and Grandparents enter into a guardianship agreement to ensure that Child would be cared for should something happen to him, and on April 22, 2019, they did so.  Temporary Guardianship Agreement, 4/22/19.

In June 2019, the maternal grandmother of Father's three older children successfully obtained custody of them, after a Children and Youth Services investigation revealed that Father was using drugs again.  The same day that

the three older children left Grandparents' home, June 8, 2019, Father left Grandparents' home, indicating he was going to visit his father for a few days, leaving Child behind.  He did not return to Grandparents' home after that visit, and instead travelled to Georgia, to see friends and to scatter a portion of his wife's ashes.  He spoke once to Child on the phone, because Grandparents telephoned him, but did not communicate otherwise with Child or Grandparents until July 5, 2019, when he called to inform Grandparents that his brother had passed away, and Grandparents took Child to his uncle's funeral.

In July 2019, with Father's consent, Grandparents enrolled Child in professional counseling to address his enormous grief and perceived inability to cope with the loss of Mother.  Father saw Child two or three times in July and August 2019; in July, he returned to remove his belongings from Grandparents' home and in August, he inquired about the possibility of returning to Grandparents' home with his three older children.  Grandparents sought the advice of the professional counselor, who recommended that they decline the request.  Notwithstanding Father's inquiry about moving back to Grandparents' home with his older children, he later testified that he began a romantic relationship, and moved in with, a woman and her two children on July 5, 2019, and they were married in February 2020.  ***See*** N.T., 10/1/21, at 318, 416.

Father did not contact Child in September 2019 and visited him once in October 2019, and again several times during the 2019 Thanksgiving and Christmas holidays. He did not see Child in January or February 2020.

In March 2020, after discovering during criminal proceedings for Mother's heroin dealer that Father had in fact been with Mother at the time she purchased the heroin, Grandparents decided to file for primary physical and sole legal custody of Child. In April 2020, Father revoked the temporary guardianship agreement he had previously signed. On August 27, 2020, an interim consent custody order was entered awarding legal and physical custody to Grandparents; Father was granted supervised visitation one time each week, increased by an October order to two times per week, supervised. Father had not contributed any funds to help care for Child and in September 2020, Grandparents filed for child support. On February 8, 2021, Grandparents filed a petition for involuntary termination of parental rights. Hearings were held on July 8, 2021, September 24, 2021, and October 1, 2021, at which time the orphans' court ordered Father's parental rights terminated pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2) and (b). On October 15, 2021, Father timely filed a notice of appeal and a concise statement of matters complained of on appeal.

Before this Court, Father presents three questions for review:

> I.      Whether the trial court abused its discretion by finding that grounds existed to terminate the father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1)?

II.     Whether the trial court abused its discretion by finding that grounds existed to terminate the father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

III.    Whether the trial court abused its discretion by finding that sufficient evidence existed to terminate father's parental rights pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 16-28.

Our standard of review in termination of parental rights cases is well-settled:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotations marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b); determination of the needs and welfare of the child under the standard of best interests of the child.

- 6 -

*In re L.M*., 932 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citations omitted). Here, the court terminated Father's parental rights to Child pursuant to Sections 2511(a)(1), (a)(2), and (b). We need only agree with the court as to any one subsection of 2511(a) as well as Section 2511(b) to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We therefore address Father's claim under subsection (a)(2) and (b).

Under section 2511(a)(2), the petitioners were required to establish by clear and convincing evidence, that: (1) Father's conduct demonstrates repeated and continued incapacity, abuse, neglect or refusal to assume parental responsibility for Child; (2) such incapacity, abuse, neglect or refusal caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) Father will not remedy the causes of the incapacity, abuse, neglect or refusal. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citations omitted). The grounds for termination are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id*.

Father argues that there has been no evidence produced to demonstrate abuse, neglect or refusal to accept parental responsibilities for Child; he

asserts that to the extent his "lesser involvement" with Child between July 2019 and March 2020 can be characterized as neglect or refusal to accept his responsibilities, he has remedied that through his defense of Grandparents' child custody action. Father's Brief at 25. He testified that between July 2019 and the date he was served with the custody complaint in March 2020, he saw [Child] "at least once a month," with the visits arranged by calling Grandmother and asking her whether it was okay for him to come to Grandparents' house after work. N.T., 10/1/21, at 351. He explained that when he left Child with Grandparents in 2019, he did so because he did not know where he was going to go, or if he would have a roof over his head. *Id*. at 409. Notwithstanding his inquiry to Grandparents in August 2019 as to whether he might return to their home with his three older children, he testified that on August 7, 2019, he signed an agreement with the older childrens' grandmother granting her primary custody, along with her consent that she would not request child support or money of any kind from him without his prior consent. *Id*. at 401. He admitted that he continues to drive vehicles although the last time he had a driver's license was 2012. *Id*. at 412.

Here, we find there was ample evidence to justify the orphans' court's termination of Father's parental right to Child pursuant to Section 2511(a)(2). Indeed, the court stated:

> There was much evidence in this case regarding [F]ather's incapacity and his inability to parent [Child]. The testimony of the therapist Ms. Lewis and the guardian ad litem, Renee Colbert, Esquire, as well as [F]ather's admissions, illustrate [Father's] parental incapacity. As detailed above, [Child] suffered the

devastating loss of his mother at an extremely young age. Thereafter, he essentially lost his father as well, when [F]ather simply walked out of [Child's] life and left him to be cared for by grandparents.

- - -

In addition to the concerns about [F]ather's inability to nurture [Child's] physical and emotional stability, there were concerns for [Father's] ability to provide for [Child]. Father informed Ms. Colbert that he was unemployed and that his wife was also unemployed. Father also offered testimony that raised concerns about his ability to maintain his sobriety. The history of drug addiction is well-documented in this case. Father was abusing substances at the time of [Mother's] death. Father testified that, despite his struggles with addiction, he routinely will take opiates when prescribed to him by a doctor.

The evidence clearly demonstrates that [Child's] mental, physical, and emotional well-being were best served in the care of his grandparents. Father is unwilling and incapable of serving [Child]'s best interests. . .Father's behavior demonstrated his unwillingness to meet [Child's] needs, while [G]randparents ensured that [Child] received all the love, care, and support that he needs.

TCO at 17-19.

The court determined that although Father had been exercising some of his visitation and telephone rights subsequent to the custody schedule entered into in August 2020, those actions did not meet the definition of parental duties. As was established during the hearings, for the period from August 2019 through December 2020, Father admittedly collected Child's social security benefits for his own use instead of providing those benefits for his son. *Id*. at 14; N.T., 7/8/21, at 153; N.T., 10/1/21, at 420. Father admitted that he had not attended Child's doctor or dentist appointments, and did not know the names of his medical providers, where Child attended school, or

indeed when he started school; he attended one session with Child's therapist, and made no effort to be involved thereafter. N.T., 10/1/21, at 423.

Child's guardian ad litem ("GAL") testified, regarding her visit with Father and Child while they were together at Grandparents' house, that Father "did not demonstrate that he served in a parent role." N.T., 9/24/21, at 277. She stated that she would be very concerned with Child having any time alone with Father, indicating that "[Father] couldn't redirect [Child] away from areas that were dangerous for him. He did not interact with him. He didn't say, what do you want to do [  ]?" *Id.* at 278. Child's GAL further stated:

> We have no evidence that [Father] has addressed his addiction needs. We have no evidence that he has addressed his criminal needs including – I do recall there was a DUI, which is why his license was suspended. So we have issues that he can't transport [Child]. We have issues about the housing . . . I think those are grave concerns, and they haven't been remedied.

*Id*. at 287-88.

The licensed professional counselor who has treated Child since July 2019 testified that after supervised visits with Father commenced following the August 2020 custody order, Child exhibited concerning behaviors such as aggression and changes in sleep pattern. N.T., 7/8/21, at 41-43. Grandmother testified at length regarding her efforts to comfort Child, who was two when his mother overdosed, in the days following her daughter's death. She recounted Child's terrible cries for his deceased mother at night and her attempts to console him, while Father remained in his bedroom; when she reported to Father that she and her husband had had a "really bad night

- 10 -

last night with [Child], that he was up screaming and crying for [Mother] all night," Father replied, "Yeah, I heard." *Id*. at 99. On another night shortly after [Mother] died, Child became so ill that Grandparents determined that he should be taken to Children's Hospital, where he had been treated following his birth, and when she informed Father at 4:00 A.M. that they were going to do so, he told them that he would just go to work and call them later. *Id*. at 101.

Grandmother testified that after she and her husband filed for custody in March 2020 there was no contact with Father for several months; she stated that Father began to make phone calls to Child about once a week starting in June, but it was not until August that he asked for a visit. *Id*. at 157; N.T., 9/24/21, at 171. She described the visits as "inconsistent," stating that in the last three to four months he has missed more visits than he has made; "[s]ometimes he's sick. Sometimes – once he dropped his phone in the toilet. Once he fell asleep; he wasn't feeling well. Family emergencies. There have been three or four times that he said he had a family emergency . . . [s]o it's a variety of reasons." N.T., 9/24/21, at 174-75.

At the conclusion of the hearings, held over three days, the orphans' court concluded that:

> Based on the testimony, including the testimony of Patricia Lewis, the counselor/therapist, and the testimony and report and recommendation of the [GAL] and the Court's assessment of the credibility of the witnesses that have testified in these proceedings, the Court finds that [Father] [  ], has evidenced a settled purpose upon leaving [Child] on July 5th [  ] 2019, offering

- 11 -

the maternal grandparents the guardianship of [Child], and thereafter, not acting in a parental role.

But for [Grandparents], [Father's] incapacity, neglect, and failure to act in that parental role, even as early as – or as recently as the recent visit in the summertime that the [GAL] testified to. While Father has made – has participated in some visits with [Child] and has provided gifts, [   ] I have heard no testimony of [him] acting in a parental role.

N.T., 10/1/21, at 464.   Father has failed to demonstrate that the orphans' court erred or abused its discretion in finding that there was clear and convincing evidence that his parental rights should be terminated pursuant to Section 2511(a)(2).  As stated above, we are required to accept the credibility determinations of the orphans' court, who had the opportunity to observe the witnesses and hear their testimony over three days of hearings, so long as they are supported by the record.

We must, therefore, next review the court's determination pursuant to Section 2511(b) that termination was in the best interests of Child.  Our Supreme Court has stated:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. §2511(b).  The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability . . . [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

**T.S.M**., 71 A.3d at 267.

Father asserts that the totality of evidence reveals that he has maintained a bond with Child in spite of the obstacles they have faced. Father's Brief at 28. He contended at oral argument that a formal bonding assessment is required to prevent a "he said, she said" analysis. However, subsection 2511(b) does not mandate a formal bonding evaluation. **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010). In evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well." **Id**.

At the termination hearing, Child's GAL testified that Child does not demonstrate a bond with Father. N.T., 9/24/21, at 274. She stated that during the visit she witnessed, Father "did not demonstrate that he served in a parent role," but rather, served as "a friend, a playmate." **Id**. at 277. At the conclusion of her testimony, the orphans' court asked the GAL what the effect on Child would be if the court were to terminate Father's parental rights; she responded, "I don't think it would have much effect at all. [Child] clearly had a very different relationship with his mother than he has with his father." **Id**. at 301. She commented, "this child sees [Grandfather] as his father. [Grandfather] has rocked him to sleep every single night in the big lounge chair and held him." **Id**. at 302. The orphans' court opined that:

> [T]he circumstances clearly warranted severing the parental ties between [F]ather and [Child]. Although [F]ather has made some attempts to visit [Child], call [Child], and purchase gifts for [Child], there was no evidence of a father and son bond. The testimony presented at trial demonstrated the lack of a bond between [F]ather and [Child]. [Child] does not enjoy phone calls

- 13 -

or visits with [F]ather and prefers not to discuss [F]ather in therapy. Even under ideal situations, such as playing at the park, [Child] showed indifference to [F]ather's presence and would play with other children. There is no indication of affection between [Child] and [F]ather. Additionally, the visits with [F]ather often have an adverse effect on [Child's] mood and behavior . . . .Thus, the severance of parental rights would have no detrimental effect. On the other hand, [Child] has a strong bond with [G]randparents as they are the ones who have stepped into the parental role. [G]randparents provide for [Child's] physical, mental, and emotional well-being and it was in [Child's] best interest to promote their bond while severing ties with [F]ather.

TCO at 20-21. Here, we find the orphans' court's conclusion is supported by competent record evidence, and we discern no error or abuse of discretion in its determination under Section 2511(b). Accordingly, we affirm the orphans' court order terminating Father's parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2022

- 14 -